## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DOROTHY JEWELL WEIR )
  )
  )
  )
         **Plaintiff** )
  )
**vs.** )    **CIVIL ACTION NO.**
  )    **2:11-CV-03998-KOB**
  )
**MICHAEL ASTRUE** )
**COMMISSIONER OF** )
**SOCIAL SECURITY** )
  )
  )
         **Defendant** )
  )
  )

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 10, 2010, the claimant, Dorothy Jewel Weir, applied for a period of disability and disability insurance benefits under Title II, and supplemental security income under Title XVI of the Social Security Act. (R. 11). The claimant alleged disability beginning on June 6, 2009, arising from gout in both feet. (R. 129). The Commissioner denied the claims initially on May 24, 2010. (R. 11). The claimant timely filed a request for a hearing before an Administrative Law Judge, and the ALJ held the hearing on June 16, 2011. (R. 25). In an opinion dated July 19, 2011, the ALJ found that the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act, and, therefore, was ineligible for both a period of disability and disability insurance benefits, as well as supplemental income. (R. 22). The Appeals Council subsequently denied the claimant's request for

1

review on September 23, 2011, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). As the claimant has exhausted her administrative remedies, this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The court has before it the following issues for review:

(1)    whether the ALJ and the Appeals Council properly considered Dr. Guy Dewees's medical opinion obtained by counsel after the hearing;

(2)    whether the ALJ properly considered all of the claimant's impairments in combination with each other in determining whether the claimant was disabled;

(3)    whether the ALJ properly applied the Eleventh Circuit's three-part pain standard, and thus, properly discredited the claimant's subjective testimony of pain and tingling in her feet; and

(4)    whether the ALJ committed reversible error in considering the claimant's noncompliance with her treating physician's plan of care in light of the claimant's financial hardship.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

2

This court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look not only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the claimant presently unemployed?
(2) Is the claimant's impairment severe?
(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform his or her former occupation?
(5) Is the claimant unable to perform any other work within the national economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

A hearing before an ALJ is not an adversarial proceeding; thus, the ALJ has a duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Graham*, 129 F.3d at 1422. This duty requires the ALJ "to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). The claimant

3

in a proceeding may submit evidence without restriction until the ALJ renders his decision. 42 U.S.C. § 402(j)(2). New and material evidence may be presented to the Appeals Council, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *Falge v. Apfel*, 150 F.3d 1320, 1322-24 (11th Cir. 1998). New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Id.* at 1323.

Where a claimant alleges multiple impairments, the Commissioner must consider the combined effect of all impairments in determining disability, not merely the individual effects of the several impairments. *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker*, 826 F.2d at 1001; 20 C.F.R. § 416.923. Even where an individual impairment would not render the claimant disabled, the combination of the claimant's impairments may establish disability. *Caulder v. Bowen*, 791 F.2d 872, 880 (11th Cir. 1986).

When evaluating subjective complaints such as pain, the Commissioner must apply the Eleventh Circuit's three-part pain standard. The Commissioner must determine whether

(1)     there is evidence of an underlying medical condition; and either
(2)     objective medical evidence confirming the severity of the alleged pain arising from that condition, or
(3)     that the objectively determined medical condition is of such a severity that it can reasonably be expected to cause the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

Further, in evaluating subjective claims including pain, the Commissioner may consider the claimant's ability to perform certain activities of daily living (ADLs), as well as the impact of such activities on the claimant's credibility. 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I); *see also*

4

*Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (finding that ADLs may be relevant to the fourth step of the sequential process).

Finally, refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison*, 355 F.3d at 1275. If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id*. If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, though, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id*.

## V. FACTS

The claimant was fifty-three years old at the time of the administrative hearing and has completed the twelfth grade. (R. 114, 130). The claimant has past work experience as a laundry worker. (R. 40). The claimant alleged that she was disabled by gout beginning on June 6, 2009. (R. 114, 129).

### *Physical Limitations*

On August 27, 2007, the claimant visited her primary care physician, Dr. Xuan-Dao Thi Pham, complaining of a pruritic rash on her hands (later diagnosed as edematous dermatitis on January 25, 2008, see discussion *infra*). (R. 297). Dr. Pham described the condition as dermatitis, and prescribed a hydrocortisone topical cream. In addition, Dr. Pham noted hypertension, hyperlipidemia, and obesity as current problems. (R. 300).

On January 14, 2008, the claimant visited Dr. Pham complaining of pain and swelling in her

right ankle. The claimant told Dr. Pham that her ankle had been hurting for approximately one week, and that she had experienced similar symptoms the previous year. (R. 286). Dr. Pham diagnosed the claimant with gout and anemia, in addition to her systemic hypertension, hyperlipidemia, and obesity (all diagnosed in 2003). Dr. Pham prescribed ferrous sulfate, Indocin (for gout), Prinivil, hydrocholorothiazide, and Crestor. (R. 289).

On January 25, 2008, the claimant again visited Dr. Pham, complaining that she had been itching all over for three days, and had a rash on her right fingers. (R. 280). Dr. Pham diagnosed the claimant with atopic eczematous dermatitis, and prescribed a topical steroid and generic Benadryl to treat the itching. (R. 283).

On February 25, 2008, the claimant returned to Dr. Pham for a followup visit where she stated that she was doing well and complained of no new symptoms. (R. 273) Dr. Pham noted that the atopic eczematous dermatitis had improved and renewed the prescription for the topical steroid and the generic Benadryl. (R. 276).

The claimant complained of no symptoms again until March 16, 2009, when she saw Dr. Pham because of frequent and painful urination. (R. 235). Dr. Pham diagnosed the claimant with a urinary tract infection and prescribed Bactrim. Dr. Pham also noted hypertension, hyperlipidemia, and obesity as continuing problems, but made no mention of any dermatitis. (R. 238).

On June 3, 2009, the claimant visited Dr. Pham at the Baptist Health Center Emergency Room, complaining of foot pain. The claimant reported that she had experienced intermittent pain in her toes and feet for the previous six months, and that she had experienced constant pain for the past fourteen days. (R. 184). Dr. Pham diagnosed the claimant with gout and told her that she had too much uric acid in her blood. Dr. Pham prescribed Lortab and a steroid for the claimant's pain.

6

(R. 179).

On June 10, 2009, the claimant returned to Dr. Pham, who diagnosed the claimant with gout, but noted that the claimant reported no foot pain at the visit. (R. 225).

The claimant visited Dr. Pham again on October 16, 2009 for a follow up, but complained of no symptoms. (R. 216). Dr. Pham noted hypertension, hyperlipidemia, obesity, and gout as current problems, but commented that the gout was not a problem at that visit. (R. 219).

At another followup visit on November 17, 2009, the claimant did not complain of any gout-related pain, and Dr. Pham made no mention of gout as a current problem. (R. 209, 212).

The claimant visited Dr. Pham for another followup on February 24, 2010, again complaining of no specific problems. (R. 203). Dr. Pham noted Hypertension, Hyperlipidemia, Obesity, and Nicotine Dependence as current problems, but made no mention of gout. (R. 206).

On March 10, 2010, the claimant completed her application for disability benefits and Supplemental Security Income with the Social Security Administration. The application contained a functional assessment questionnaire. On the form, the claimant stated that her ADLs included washing her face, preparing meals, cleaning the kitchen, childcare, and propping her feet up while watching television. She stated that her condition limited the amount of time she could stand, and the pain occasionally woke her during the night. The claimant reported that she could not wear certain types of shoes and that she struggled to stand in the tub. Further, she claimed that her condition inhibited her toilet use because her knees would "give out." (R. 145-151).

The claimant wrote that she washed dishes every day and that she usually required fifteen minutes to complete the dishwashing. The claimant also wrote that she went outside every day, and that she could drive when required. She wrote that she shopped for food and personal hygiene

products approximately once a month with her daughter. The claimant then wrote that because of her condition, she struggled in lifting, squatting, standing, walking, sitting, kneeling, climbing stairs, and using her hands. *Id.*

The claimant further elaborated that she could lift only twenty-five pounds, could not squat when her knees were swollen, could stand for only ten to fifteen minutes at a time, had to prop up her feet when sitting, could not kneel when her knees were swollen, could not climb stairs, and had to wear gloves when working with her hands. However, she then stated that she could walk approximately thirty minutes before needing to take a ten minute break. She finally wrote that she had an unspecified brace or splint (prescribed in 2007), and that she had glasses (prescribed in 2003). She claimed that she needed to use both the brace and her glasses every day. *Id.*

The claimant visited Dr. Pham on March 24, 2010, this time complaining of pain associated with gout in her left foot. The claimant stated that she experienced the pain for approximately two weeks and requested prescription Indocin to relieve the pain in her right foot. (R. 195). Dr. Pham noted hypertension, hyperlipidemia, obesity, nicotine dependence, and gout as current problems, and prescribed Indocin for the claimant's gout pain. (R. 198).

On May 19, 2010, the claimant visited Dr. Pham complaining of a gout flare up in her right knee, right ankle, and left elbow. The claimant stated that the prescription Indocin helped her gout pain. (R. 329).

On June 28, 2010, the claimant visited the Baptist Health Center Emergency Room[1] complaining of joint pain in both hands, her left elbow, and left ankle. The emergency room advised

---

[1]No documentation of this visit exists in the administrative record. The only reference to the visit appears at R. 326 in a note by Dr. Pham.

the claimant to visit a rheumatologist. (R. 326).

On August 24, 2010, the claimant visited Dr. Pham and requested a referral to a rheumatologist. Dr. Pham listed "consultation with a rheumatologist" as "therapy" associated with this visit, but did not mention a referral at this visit. Dr. Pham also noted the presence of tophus on the claimant's left elbow, and scaly, hyperpigmented, thick skin on the claimant's fingers on both hands. (R. 327, 328).

On October 25, 2010, the claimant returned to Dr. Pham complaining of weakness and buckling in both knees when standing, ascending, and descending stairs. The claimant had experienced this issue for approximately 2 months. Dr. Pham diagnosed the claimant with hypertension, esophageal reflux (resolved without any medication), hyperlipidemia, obesity, gout, nicotine dependence (resolved by smoking cessation in August, 2010), eczematoid dermatitis (with a referral to a dermatologist on December 21, 2010), and  localized osteoarthritis of the knee (with a referral to a rheumatologist on December 13, 2010). (R. 324-328).

The claimant saw Dr. Pham for a follow up on December 2, 2010, where she complained of no gout-related symptoms. Dr. Pham noted that the gout was stable, and not a problem at that visit. Dr. Pham further recorded no musculoskeletal symptoms, no muscle aches, no arthralgia, no muscle cramps, and no muscle spasms. (R. 471).

On December 13, 2010, the claimant visited Dr. Laura Hughes, a rheumatologist and internist, at the Cooper Green Mercy Hospital Rheumatology Clinic. (R. 444). The claimant complained of joint pain in both hands, her left elbow, and left ankle. The claimant reported having gout in both feet for 3 years, resulting in swelling in her first toe, foot, and ankle. The claimant reported knee pain and swelling, as well as elbow pain since June 2010. Additionally, the claimant

reported constant shoulder pain, stating that she could not lay on her shoulder and that she experienced pain in rotation and overhead abduction. Dr. Hughes also noted that the claimant had puffy hands with dry patches, and numbness in her feet. The claimant described her overall pain level as a 10 out of 10. (R. 456). Dr. Hughes administered a subacromial injection to the claimant's left shoulder to alleviate her pain. Dr. Hughes also prescribed Colchicine and Allopurinol for the claimant's gout. (R. 455, 456).

On December 21, 2010, the claimant visited Dr. Ryan Nash, a dermatologist at the Cooper Green Mercy Hospital Dermatology Clinic. The claimant complained of blisters on her hands for the previous six months. She stated that her hands itched constantly, that she received fluticasone cream from an outside facility, and that she used Dial soap and Vaseline. Dr. Nash diagnosed the condition as hyperpigmented macules with collarettes of scale on the volar surfaces of her fingers and palms. Dr. Nash classified the condition as dyshidrotic eczema and prescribed both Benadryl and the use of special soaps and petroleum jelly on her hands. (R. 440).

On March 14, 2011, the claimant returned to the Cooper Green Rheumatology Clinic complaining of joint pain. Dr. Archana Jain, a rheumatologist, diagnosed the claimant with asymmetric polyarthritis (likely gout), noting no improvement in the claimant's shoulder pain. Dr. Jain did note that the claimant's eczema was clearing. The claimant reported shoulder pain, painful buckling knees, and cramps throughout her legs, but no gout flares since her previous visit to the clinic on December 13, 2010. Dr. Jain renewed the claimant's prescription for Colchicine and Allopurinol for the claimant's gout. The claimant also received injections of Depo-Medrol and Lidocaine in her left shoulder. (R. 426, 427). The clinic then referred the claimant to outpatient physical therapy for shoulder rehabilitation and strengthening. (R. 424).

10

The claimant sought treatment at Cooper Green with Dr. Herman Turner, a physical therapist, on March 17, 2011. The claimant reported that her legs were becoming very tight, but that her shoulder was moving better. Dr. Turner diagnosed the claimant with chondromalacia patellae of the knees and subacromial impingement in her left shoulder. Dr. Turner also noted that the claimant's objectives for therapy were increased range of motion in the shoulder (Flexion/Abduction at 150 degrees), and increased strength in the right quadriceps (4-/5). Dr. Turner concluded that the claimant's treatment had increased her overall functional mobility and strength, and recommended physical therapy one to two times per week. (R. 422).

On May 3, 2011, the claimant visited Dr. Pham. The claimant did not report any new symptoms, but Dr. Pham noted that the claimant had taken Meloxicam for one month to treat shoulder pain as prescribed by Dr. Hughes.[2] Dr. Pham listed the shoulder pain as localized osteoarthritis of the shoulder. (R. 465-467).

On May 25, 2011, the claimant visited the Cooper Green Emergency Room complaining of moderate gout pain in her right foot and right first toe. The claimant reported that she ran out of her gout medication. Dr. Abiodun Badewa diagnosed her with acute gouty arthritis. The record does not indicate what if any treatment Dr. Badewa administered, but Dr. Badewa did note that the claimant had run out of her gout medication. (R. 483, 484).

On July 12, 2011, after the ALJ hearing, the claimant visited Dr. Guy B. Dewees at the Norwood Clinic. Dr. Dewees evaluated the claimant and found that she could lift only 10 pounds occasionally or less frequently. Dr. Dewees found that the claimant could sit or stand only one hour

---

[2]Neither rheumatologist noted Meloxicam on their respective records, but Dr. Pham specifically remarked that Dr. Hughes prescribed the drug. The hospital medicine log lists the prescribing physician as an "outside provider." (R.459).

out of an eight-hour day, and that the claimant could never perform pushing and pulling movements, climbing and balancing, stooping, and reaching in the course of work activities. (R. 169).

Dr. Dewees then gave a clinical assessment of pain on a form the claimant's attorneys prepared for this examination. To the question, "to what extent is pain of significance in the treatment of this patient," Dr. Dewees selected "pain is present to such an extent as to be distracting to adequate performance of daily activities or work." (R. 170). When asked, "to what extent will physical activity, such as prolonged sitting, walking, standing, bending, stooping, moving of extremities, etc., increase the level of pain experienced by this patient," Dr. Dewees selected "greatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of tasks." *Id*. Next, when asked "in your best judgment, to what extent will the side effects of the prescribed medication impact upon this patient's ability to perform work activity," Dr. Dewees selected "drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." (R. 171). Dr. Dewees finally answered "does this patient have an underlying medical condition consistent with the pain he or she experiences" with "yes."*Id*.

At the same examination, Dr. Dewees completed a "Clinical Assessment of Fatigue/Weakness." (R. 172). To the question, "to what extent is fatigue/weakness of significance in the treatment of this patient," Dr. Dewees selected "fatigue/weakness is present, but does not prevent functioning in everyday activities or work." *Id*. When asked "to what extent will physical activity, such as walking, standing, bending, stooping, moving of extremities, etc. increase the level of fatigue/weakness experienced by this patient," Dr. Dewees chose "some increase, but not to such an extent as to prevent adequate functioning in such tasks." *Id*. Next, Dr. Dewees answered the question "in your best judgment, to what extent will the side effects of the prescribed medication

impact upon this patient's ability to perform work activity," with "some side effects may be present, but not to such a degree as to create serious problems in most instances." (R. 173). To the question "does this patient have an underlying medical condition consistent with the fatigue/weakness he or she experiences," Dr. Dewees selected "yes." *Id*. The claimant's attorneys prepared both forms, and the forms contained multiple choice answers for Dr. Dewees to select.

## *The ALJ Hearing*

The Commissioner denied the claimant's applications for Disability Insurance Benefits and Supplemental Security Income on May 24, 2010. (R. 48, 53). The claimant requested a hearing before an ALJ, and the ALJ held the hearing on June 16, 2011. (R. 95). In addition to testimony by the claimant, the ALJ also heard testimony from Dr. William Green, a vocational expert. (R. 93). The ALJ began the hearing by questioning the claimant's attorney. At the hearing, the claimant alleged disability because of gout in both feet. After a serious episode of gout on June 6, 2009, the claimant's attorney testified that the Northern Health Clinic ER gave the claimant steroids to treat the gout. The claimant's attorney stated that the claimant found the medication beneficial, but she still experienced tenderness in her feet, rendering her unable to complete more than about two hours of household work per day. The claimant's attorney testified that the claimant's disability began on June 6, 2009. (R. 27, 28).

The ALJ noted that the claimant's most severe bouts of gout aligned with her running out of gout medication. The ALJ asked the claimant if she had financial difficulties with keeping her medication in stock, and the claimant agreed and stated that she sometimes could not afford her medicine and had to wait until her daughter received a pay check to purchase more medicine. The ALJ then took notice of the claimant's near monthly visits to Dr. Pham in 2009 and 2010, remarking

13

that sometimes the records indicated no problems with gout. (R. 30, 31).

The ALJ next questioned the claimant about the problems in her knees and shoulder. The claimant stated that she had arthritis in her knees and was seeing a physical therapist. The claimant stated that the therapy was effective, but she still experienced  intermittent pain and swelling. The ALJ remarked that the Meloxicam prescribed for the claimant's shoulder pain should be effective for any joints with arthritic problems, and that the claimant was scheduled to receive another injection in her shoulder the following month. However, he did not ask the claimant about the effectiveness of Meloxicam in treating her shoulder pain. (R. 32-34).

The ALJ proceeded to discuss with the claimant her typical day. The claimant stated that she generally began her day around 9:30 AM. She then testified that she would cook breakfast, lounge around the house, and finally clean up after her breakfast around 11:00 AM.  Because her feet would begin to tingle, the claimant asserted that she needed periodic breaks while cleaning the kitchen. Preferring not to eat a lot of food during the day, the claimant stated that she generally ate only an orange for lunch. The claimant then testified that after lunch she watched television. (R. 34, 35).

The claimant stated that she lived with her thirty-year-old daughter and her three grandchildren (ages 6, 4, and 6 months at the time of the hearing). (R. 36). When the grandchildren were not in school, the claimant maintained that she cared for them during the day. The claimant testified that she sometimes prepared dinner for her entire family, while other times the grandchildren prepared themselves bowls of cereal. The claimant then noted that after dinner she usually bathed and watched television until approximately 9:00 PM when she went to bed. (R. 36-38).

The ALJ then asked the claimant about her activities outside the house. First, the ALJ asked

14

the claimant if she performed any shopping. The claimant stated that she sometimes accompanied her daughter to shop for groceries and personal hygiene products. The claimant stated, however, that she did not drive. (R. 38).

The claimant's attorney then questioned her about other housework. The claimant admitted to washing dishes or cleaning the kitchen during the day, but claimed that she had to take frequent breaks because her feet would tingle when standing for extended periods. When her feet tingled, the claimant stated that she would elevate her feet in a small chair with a pillow. The claimant also stated that while she watched television during the day, she elevated her feet. (R. 38, 39).

Finally the ALJ asked the claimant about certain restrictions that Dr. Pham imposed on her. The claimant stated that Dr. Pham advised her not to drink alcohol, and not to eat dry beans, liver, and many other foods.[3] The claimant testified to no times when Dr. Pham imposed physical limitations on her. (R. 39, 40).

The ALJ then examined Dr. Green, the Vocational Expert. Dr. Green testified that the claimant had two primary sources of income in the previous fifteen years: UniFirst Corp and Howards Laundry. Dr. Green classified both of these jobs as laundry worker III, semi-skilled, with an exertional level of light. Dr. Green stated that none of the skills associated with those positions transfer to other jobs, as those skills were unique to the industry. The ALJ then asked Dr. Green if a hypothetical individual with the same age, education, and work experience as the claimant, who could perform light exertion and required a sit/stand option could perform the laundry worker III position. Dr. Green responded that such an individual could not perform the laundry worker III position. (40, 41).

---

[3]These restrictions do not appear otherwise in the administrative record.

However, Dr. Green did identify two jobs that such an individual could perform. First, Dr. Green identified the cashier position as an unskilled job with light exertion (though some are sedentary), and the sit/stand option can easily be accommodated with a stool. Dr. Green testified that approximately 1,700 cashier jobs exist in Alabama, with approximately 110,000 jobs nationally. Dr. Green then identified the job of gate guard as a semi-skilled and light exertion position. Dr. Green stated that approximately 1,200 gate guard jobs exist in Alabama and approximately 115,000 jobs exist nationally. Dr. Green testified that these two jobs were only representative examples, and that other jobs existed in the national economy that fit the specified profile. Dr. Green testified that cashier and assembly worker also would qualify as unskilled, sedentary positions, and that these positions exist in significant numbers in the national economy. (R. 41-43).

With unskilled jobs, Dr. Green testified that an employee generally could take a fifteen minute break in the morning and afternoon, thirty minutes for lunch, and an unscheduled, five minute break in both the morning and afternoon. Dr. Green noted that an unskilled worker in the present job market would generally be permitted one absence per month. (R. 43, 44).

The claimant's attorney then questioned Dr. Green about a hypothetical worker with symptoms similar to those reported by the claimant. The attorney asked Dr. Green about the viability of performing those jobs when the employee needed to elevate her feet three to four times a day, as long as forty-five minutes per time. Dr. Green testified that such a requirement did not "lend itself to successful employment." Dr. Green then clarified that he was aware of no jobs that an individual with such a need to recline throughout the day could perform successfully. (R. 44, 45).

*The ALJ Decision*

On July 19, 2011, the ALJ issued a decision finding that the claimant was not disabled under

Sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act, and denied her application for a period of disability and disability insurance benefits, and supplemental security income. (R. 22). Before announcing his findings of fact, the ALJ described in great detail the five-step sequential evaluation process that would be the basis of his analysis. (R. 12, 13).

First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through December 31, 2009. Then, under the first step of the five-step sequential evaluation process, the ALJ found that the claimant had engaged in no substantial gainful employment since June 6, 2009, the alleged onset date of her disability. Next, under the second step of the five-step sequential evaluation process, the ALJ found that the claimant had the severe impairments of obesity, gout, osteoarthritis, hypertension, and hyperlipidemia. The ALJ noted that the claimant had periodically complained of, and received treatment for dermatitis on her hands, but that the claimant's reports of rash-related symptoms were inconsistent. The ALJ remarked that although the claimant reported no rash-related symptoms to Dr. Pham after June 2008, she listed on her application for benefits that her hands blistered after frequent use. The ALJ found that although such a case of dermatitis was a medically determinable impairment, her condition was not so frequent as to significantly limit her ability to perform work-related activities, as evidenced by her performance of ADLs. (R. 13, 14).

Similarly, the ALJ evaluated the claimant's shoulder injury, finding that although the claimant noted September 2010 as the onset date of her shoulder pain, she made no mention of it to any physician until her visit to the rheumatology clinic in December 2010. The ALJ noted that at her March 17, 2011, physical therapy evaluation, the claimant expressed difficulty in completing ADLs involving her upper extremities. The ALJ also noted that after the session, the claimant showed

17

marked improvement, and stated that her shoulder felt better. Thus, the ALJ found that the shoulder impingement was not an impairment that, given proper rehabilitation, would present more than minimal work-related limitations beyond twelve months of onset. The ALJ finally noted that Dr. Pham's diagnosis of Nicotine Dependence, though medically determinable, imposed no work-related limitations upon the claimant, who had ceased smoking in August 2010. (R. 14, 15).

Under the third step of the five-step sequential evaluation process, the ALJ found that the claimant did not have an impairment or combination of impairments that met or equaled one of the listed impairments. Though the former listing for obesity was now obsolete, the ALJ mentioned his inclusion of obesity because SSR 02-1p and Sections 1.00Q and 4.00I of the listings required evaluation of obesity at this step, as it is a risk factor for an increased chance of muscoloskeletal or cardiovascular impairments. *Id*.

First, the ALJ found that the claimant's impairments did not meet the criteria in section 1.02 of Appendix 1 of the listings, because she retained the ability to ambulate effectively in the face of any joint dysfunction or impairment. The ALJ noted that Dr. Pham prescribed the claimant a leg brace in 2007[4], but that the claimant routinely ambulated without the use of any assistive device. Further, the ALJ concluded that the claimant experienced an altered gait only during rare and short-lived gout episodes. *Id*.

Similarly, the ALJ found that the claimant's gout-related impairments did not meet the criteria in section 14.09 of the listings. The claimant presented no evidence that her gout affected any other body system to at least a moderate degree of severity, no evidence of severe  constitutional symptoms associated with gout, and no evidence that the gout caused more than mild to moderate

---

[4]The claimant's medical records do not reflect a leg brace in 2007.

limitation of ADLs. Finally, the ALJ found that the claimant's impairments did not meet the criteria in section 4.02 of the listings because no evidence existed in the record that the claimant developed any cardiac complications, and both the claimant's hypertension and hyperlipidemia appeared stable with the use of medication. (R. 15, 16).

The ALJ then undertook to determine the claimant's residual functional capacity (RFC). The ALJ concluded that the claimant had the RFC to lift, carry, and push/pull 20 pounds occasionally, and 10 pounds frequently; to stand and walk, combined, for six hours in an eight-hour day; to sit for six hours in an eight-hour day; and to otherwise perform light work with a sit or stand option. In performing this evaluation, the ALJ announced a truncated version of the Eleventh Circuit's pain standard. First, the ALJ considered whether the claimant exhibited a medically determinable physical or mental impairment. Second, the ALJ considered the "intensity, persistence, and limiting effects" of the claimant's impairment, and the extent to which the impairments affected the claimant's functioning. Absent objective medical evidence, the ALJ announced that he would evaluate the credibility of the claimant's statements against the weight of the entire record. *Id*.

The ALJ found that although the claimant's medically determinable impairments could reasonably cause the symptoms described by the claimant, her statements were not credible to the extent that they were inconsistent with her own functional capacity assessment and medical history. The ALJ noted that in her questionnaire, the claimant identified swelling in her feet as the only condition that limited her ability to work. Further, the ALJ noted that the claimant wrote that she could lift twenty-five pounds, could stand for ten to fifteen minutes, walk for thirty minutes, had difficulty climbing stairs, needed frequent rests to elevate her feet, and needed to wear protective gloves. Although medical records do indicate increased uric acid levels along with joint pain,

swelling, and warmth, the ALJ found no evidence of uric acid crystal formation in the record, and that the claimant's gout episodes were well controlled with medication. The ALJ then stated that at no time during the six month period prior to the claimant's initial ER visit for gout did the claimant mention any such symptoms to Dr. Pham, even though she complained to the ER that she had experienced gout symptoms for six months. The ALJ also found that Dr. Pham's examinations regularly revealed no musculoskeletal issues. (R. 17).

The ALJ remarked that eight months after the claimant's ER visit, she again reported gout in her left foot to Dr. Pham. The ALJ reasoned that his pain coincided with the claimant running out of Indocin. The ALJ also found that at the October 25, 2010 visit, the claimant reported that her knees were "giving out" when standing or descending stairs, but Dr. Pham found no abnormalities or evidence of dysfunction associated with the knees. The ALJ further found that on December 2, 2010, the claimant reported no musculoskeletal issues, and Dr. Pham discontinued the Naprosyn. However, the ALJ noted that only eleven days later at the rheumatology clinic, the claimant reported that she had experienced right knee and left elbow swelling since June 2010, and that she had shoulder pain since September 2010. The ALJ also articulated that while the claimant complained of numbness in her feet and general stiffness throughout the day at the rheumatology clinic, the clinic made no findings associated with numbness and the claimant never mentioned such symptoms to Dr. Pham. (R. 18).

The ALJ further noted that when the claimant visited Dr. Pham again in February 2011, she made no complaints about her symptoms, and at a rheumatology follow up on March 14, 2011, reported no gout episodes since her December visit. The ALJ admitted, though, that the claimant did note bilateral knee pain and cramping in her thighs. However, the ALJ found that the PT attributed

the claimant's knee pain to muscle weakness, and therapy improved the claimant's strength and range of motion. The ALJ finally remarked that when the claimant returned to the ER for a gout flare on May 25, 2011, her knee examination was normal, and she admitted that she had run out of gout medication. *Id.*

Considering the totality of the medical evidence, the ALJ concluded that the claimant's joint pain resulted from a combination of osteoarthritis and gout. Further, the ALJ considered the effect of the claimant's obesity on these conditions, and found that while the combination of her impairments affected certain exertional requirements, such as standing, walking, lifting, carrying, pushing, and pulling, it did not preclude her from performing all work activity. The ALJ admitted that it would be reasonable to expect pain associated with gout when the claimant performed such exertional activities; however, the ALJ found that the claimant's medical records did not support the likelihood of similar pains when activities were confined to her residual functional capacity. The claimant listed gout on her application as the only condition limiting her ability to work, and the ALJ reasoned that the record did not indicate that her gout episodes were so frequent or severe as to preclude many common light exertion activities. Further, the ALJ remarked that many of the claimant's gout episodes coincided with the claimant not taking gout medication, and that the claimant was noncompliant with her prescribed gout treatment. In addition, the ALJ found no evidence that the claimant reported tingling in her feet to Dr. Pham, or evidence of Dr. Pham advising the claimant to elevate her feet. Although Dr. Pham frequently urged the claimant to lose weight and exercise, the ALJ found no evidence that Dr. Pham ever instructed her to limit her physical activity. (R. 19, 20).

The ALJ gave significant weight to Dr. Pham's records, finding that as the claimant's long-

time primary care physician, his recommendations about her improvement and descriptions of her limitations were credible. Also, the ALJ found credible the ER and specialty clinicians' reports, as they were all consistent with Dr. Pham's findings. *Id.*

After determining the claimant's RFC, the ALJ found that the claimant was unable to perform her past relevant work under the fourth step of the five-step sequential evaluation process. The vocational expert testified that a hypothetical individual with the claimant's age, education level, vocational background, and RFC could not successfully perform the job of laundry worker. The ALJ also found that the claimant was considered an individual closely approaching advanced age, had at least a high school education, and could communicate in English. (R. 21).

The ALJ next noted that the transferability of the claimant's job skills was not material to the disability determination, as the use of the Medical-Vocational Guidelines as a framework supported a finding that the claimant was not disabled. The ALJ also found that given the claimant's age, education level, work experience, and RFC, and based on Dr. Green's testimony, a significant number of jobs existed in the national economy that the claimant could perform. Therefore, the ALJ found that the claimant had not been disabled under the Social Security Act, from the time of application on June 6, 2009, through the date of the decision on July 19, 2011. *Id.*

After the hearing, the clamant attempted to submit Dr. Dewees's report to the ALJ on July 22, 2011. (Pl.'s Br. 5). However, the ALJ reached his decision on July 19, 2011. (R. 22). The claimant then included the report as an exhibit to her Appeals Council Brief. (R. 162-173). The Appeals Council noted that it considered the report in its decision ultimately to not review the ALJ decision. (R. 1, 4, 5). The claimant's brief also refers to a narrative report by Dr. Dewees, allegedly attached to the brief as an exhibit. The claimant stated that she does not know why the narrative

22

report does not appear in the administrative record. Further, the narrative report was not actually attached to the brief. (Pl.'s Br. 4, 5).

## VI. DISCUSSION

### 1. ALJ & Appeals Council Consideration of Dr. Dewees's Report

The claimant argues that both the ALJ and the Appeals Council improperly failed to consider Dr. Dewees's report. However, this court finds that the ALJ was under no obligation to consider evidence submitted after he rendered his decision, and the Appeals Council expressly considered Dr. Dewees's report in making its determination of whether to review the ALJ's decision.

In a proceeding before an ALJ, a claimant may submit evidence without restriction until the ALJ renders his decision. 42 U.S.C. § 402(j)(2). Because a hearing before an ALJ is a not an adversarial proceeding, the ALJ has a duty to develop a full and fair record. *Ellison*, 355 F.3d at 1276; *Graham*, 129 F.3d at 1422. This duty ensures that the ALJ's decision "is rational and supported by substantial evidence." *Welch*, 854 F.2d at 440 (internal quotations and citations omitted).

When a claimant discovers new evidence after the ALJ renders his decision, the claimant may present this evidence to the Appeals Council so long as it is both new and material. 20 C.F.R. § 404.970(b); *see also Falge*, 150 F.3d at n. 4 (11th Cir. 1998).When a claimant presents new and material evidence, the Appeals Council must consider such evidence only where it relates to the period on or before the date of the ALJ decision. 20 C.F.R. § 404.970(b). While the Appeals Council may choose not to review the ALJ's denial of benefits, it must consider new and material evidence in determining whether a basis exists for changing the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *see also Falge*, 150 F.3d at 1324. New evidence is material if a reasonable possibility

exists that the new evidence would change the administrative result. *Id*. at 1323.

In the present case, the claimant alleged to have submitted Dr. Dewees's report on July 22, 2011–three days after the date of the ALJ's July 19, 2011, decision. (Pl.'s Br. 5). After the ALJ rendered his decision, he was under no obligation to review more evidence from the claimant. However, the claimant introduced the evidence after the ALJ's decision but before the Appeals Council's decision; thus, the Appeals Council was required to review this evidence so long as it was new and material.

The Appeals Council did state that it reviewed "the reasons [the claimant] disagree[d] with the decision and the additional evidence listed on the enclosed Order of Appeals Council." (R. 1). Both the Appeals Council Exhibits List and the Order of Appeals Council refer to "a physical capacities evaluation from Guy B. Dewees, MD dated 7/6/11." (R. 4, 5). This evaluation was attached to the end of the claimant's brief to the Appeal's Council and appears in the record. (R. 169-173). The court notes that this new evidence differs from the ALJ's determination of the claimant's RFC. However, because this new report was based on the examination of a consultative physician and printed on a form prepared by the claimant's attorneys, no reasonable possibility exists that this report would have changed the ALJ's decision.

The claimant also referred to a narrative report from Dr. Dewees that would limit the claimant to only sedentary work and less than half an hour of sitting and standing in an eight hour day. (Pl.'s Br. 5). This narrative report neither appears in the administrative record, nor is attached to the claimant's brief to this court. Further, the claimant provided no evidence as to why the narrative report appears neither in the administrative record, nor as an exhibit to her brief. Although the claimant's brief makes assertions about the contents of this report, this court cannot evaluate the

24

merits of such assertions without the evidence to support them. Thus, an analysis of whether the report is new and material is irrelevant, as the report has not been provided to this court.

The court finds that the record contains no narrative report referred to by the claimant, and that the claimant has offered no evidence explaining the absence of this narrative report from the record. Therefore, this court finds that any narrative report by Dr. Dewees mentioned by the claimant is not relevant to this proceeding. Regarding Dr. Dewees's report of July 6, 2011, this court finds that the claimant did not submit that report to the ALJ before he rendered his decision; the Appeals Council clearly considered the report; and no reasonable possibility exists that the report would have changed the administrative result. As such, this court finds that the ALJ and the Appeals Council properly considered that report.

### 2. Combination of Impairments

Next, the claimant alleges that the ALJ failed to properly consider the combined effects of the claimant's impairments on her functional capacity. This court finds that the ALJ properly considered the combination of all the claimant's impairments in rendering his decision that the claimant was not disabled under the Social Security Act.

In step two of the sequential evaluation process, the Commissioner must determine whether the claimant has a severe impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function. *David v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). When a claimant alleges multiple impairments, the Commissioner must consider the impairments in combination to determine whether the combined effect of the impairments renders the claimant disabled. *Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991).

Even if the individual impairments would not severally render the claimant disabled, the combination of the claimants impairments may establish disability. *Caulder*, 791 F.2d at 880. Statements from an ALJ that the claimant "did not have an impairment or combination of impairments" that met the listings constitute evidence that he considered the combination of a claimant's impairments. *Wilson*, 284 F.3d at 1224; *see also Jones*, 941 F.2d at 1533, *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986).

In this case, the ALJ concluded that the claimant did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments." (R. 15). Further, the ALJ noted that while the former listing for obesity is obsolete, he considered obesity, as "the combined effects of obesity with musculoskeletal or cardiovascular impairments can be greater than the effects of each of the impairments considered separately." *Id*. Later, the ALJ stated specifically that he considered "the additional and cumulative effects of the claimant's obesity . . . on her other impairments," and that "the evidence fails to show that the combined effect of her impairments prevents her from performing all work activity." (R. 19).

Because the ALJ clearly considered the combination of the claimant's impairments, not just the individual effects of the claimant's several impairments, the ALJ applied the correct legal standard for considering the claimant's multiple impairments, and substantial evidence supports the ALJ's decision.

### 3. Eleventh Circuit Pain Standard and the Claimant's Testimony

The claimant also alleges that the ALJ improperly applied the Eleventh Circuit three-part pain standard and improperly discredited the claimant's own testimony. This court finds that the ALJ properly applied the Eleventh Circuit pain standard, and properly discredited the claimant's own

26

testimony by referring to various ADLs the claimant routinely performed.

When a claimant attempts to establish her disability through testimony of subjective symptoms, the Eleventh Circuit three-part pain standard applies. The pain standard requires a showing of

> (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising from the condition or
> (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Holt*, 921 F.2d at 1223.

Pain alone can be disabling, and in some circumstances a claimant's subjective testimony, supported by medical evidence that satisfies the pain standard, can be sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561. The ALJ is not required to recite the pain standard verbatim, but must make findings indicative of a correct application of the standard. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). When the ALJ decides to discredit the claimant's testimony of pain, he must do so explicitly, and with adequate reasons. *Id*. In discrediting the claimant's complaints of pain, the ALJ may consider the claimant's ADLs. *See Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). Finally, the opinions of treating physicians must be given substantial weight by the commissioner, whereas the opinion of a consultative physician may be credited above that of a treating physician only for good cause. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

In his decision, the ALJ referred to a "two-step process" where the ALJ must first find whether the claimant has a medically determinable physical or mental impairment that could reasonably be expected to cause the claimant's pain; then, the ALJ must determine the extent of the

27

intensity, persistence, and limiting effects on the claimant's ability to function. Although the ALJ did not announce the analysis as a "three-step process," he correctly applied the Eleventh Circuit's test to these facts. The ALJ found that the claimant did have medically determinable impairments that could reasonably be expected to cause the claimant's pain.

However, the ALJ discredited the claimant's personal testimony as against the great weight of the medical evidence in the record. Although the claimant identified gout as her disabling condition, the claimant's records reflect only four episodes of gout after her alleged onset date through March 2011. Three of the four episodes occurred within a three month period in 2010. The fourth episode occurred nearly a year later when the claimant was not taking her gout medication as prescribed. The ALJ, referring to the claimant's functional assessment questionnaire, recounted that the claimant wrote she cooked, cleaned, cared for her grandchildren, shopped, and occasionally socialized during this time.

The ALJ then looked to the claimant's limitations on the questionnaire, many of which only caused problems when the claimant's knees swelled. The ALJ found that these symptoms were reasonable, given the frequency of the claimant's gout flares at the time the claimant completed the questionnaire. However, the ALJ noted that the claimant's gout episodes were rare after June 2010, and the claimant's functional status should have returned to a more normal level in the absence of frequent gout flares.

Further, although the claimant complained of tingling in her feet when standing for an extended period at the hearing, the ALJ found no evidence in the record of such a complaint made to Dr. Pham, or evidence of a treating physician advising the claimant to elevate her feet while sitting. Dr. Pham even advised the claimant to maintain regular exercise without listing any physical

limitations. The ALJ also reasoned that because Dr. Pham never prescribed any strong pain medications, or advised the claimant to elevate her feet, the subjective testimony of the severity of the claimant's impairment was inconsistent with Dr. Pham's plan of treatment. As Dr. Pham was the claimant's primary care physician, the ALJ was entitled to accord substantial weight to Dr. Pham's findings.

In identifying specific portions of the claimant's medical records, and referring to her own testimony about completing various ADLs, the ALJ properly articulated explicit, adequate reasons to discredit the claimant's pain testimony. Also, the ALJ properly discredited the claimant's testimony by weighing both the medical findings of her treating physician Dr. Pham and her performance of various ADLs against her personal testimony. Thus, the ALJ correctly applied the Eleventh Circuit's three-part pain standard, and substantial evidence supported his findings.

### 4. The Claimant's Financial Hardship

Although the claimant did not raise her inability to afford medication as an issue before this court, the court will evaluate whether the ALJ committed reversible error in finding that the claimant was noncompliant with her medication in the face of the claimant's poverty. This court finds that because the claimant's noncompliance was neither a substantial factor, nor the sole factor in the ALJ's decision to deny the claimant disability benefits, the ALJ did not commit reversible error.

Refusal by a claimant to follow prescribed medical treatment without good reason will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison*, 355 F.3d at 1275. If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination

regarding the claimant's ability to afford treatment. *Id*. If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id*.

In the present case, the record indicates that the claimant routinely ran out of her gout medication. At the hearing, the ALJ asked the claimant if she experienced difficulty in keeping her medicine in stock, and the clamant testified that she often had to wait until her daughter could afford to purchase more medicine. In his opinion, the ALJ found that the claimant "has been noncompliant in taking prescribed gout medication." Because the ALJ at the hearing inquired of the claimant whether she could afford her medicine, and because the ALJ deemed the claimant noncompliant, the ALJ must consider the claimant's poverty in making his determination of disability.

However, the ALJ did not substantially base his decision on the claimant's noncompliance. The ALJ focused on the inconsistencies between the claimant's subjective testimony at the hearing, and the claimant's medical history and interactions with her treating physicians. While the ALJ did find that the claimant's functional capacity would improve while taking gout medication, the basis of his decision was the disparity between Dr. Pham's records and treatment, and the claimant's testimony that she had to frequently elevate her feet to avoid pain and tingling.

Therefore, because the ALJ did not substantially or solely base his finding of nondisability on the claimant's noncompliance with her gout medication, he did not commit reversible error in failing to consider the claimant's financial hardship.

### VII. CONCLUSION

For the reasons stated, this court finds that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court simultaneously will enter a separate Order

to that effect.

DONE and ORDERED this 30th day of May, 2013.

KARON OWEN BOWDRE
UNITED   STATES   DISTRICT   JUDGE